HYNES, Respondent, vs. HOLT LUMBER COMPANY, Appellant.

*October 5—October 24, 1911.*

*Master and servant: Dangerous machinery: Duty of master to explain: What servant is bound to know: Presumptions.*

1. An employer who sets inexperienced or youthful employees at work about complicated machinery is charged with the duty of explaining to them any dangers which exist about such machinery and which are not obvious to employees of like apparent age and experience while exercising ordinary care.

2. But employees of ordinary intelligence are bound without explanation or warning to know and act upon those simple natural laws and physical facts which are universally acted upon by persons of like apparent intelligence in the ordinary affairs of life.

3. While the water tank on a steam log hauler was being filled by means of a steam siphon, plaintiff, whose duty it was to assist in such filling, started to take off a metal cap (which he had himself substituted in place of a wooden plug with a vent hole) upon an opening in the top of the tank, and was injured by the cap being suddenly blown off as he removed its fastening. It appearing that plaintiff was a man twenty-six years old, of ordinary intelligence, with a common-school education and twelve years' experience in lumber camps and with machinery in sawmills, and that he had some knowledge of elementary natural laws and considerable mechanical ingenuity and initiative, he is conclusively presumed to have known, without special warning, the dangers which might arise from pressure in the tank while it was being filled in that way in case there were no vent hole in the cap or in case the vent therein should become obstructed by freezing.

APPEAL from a judgment of the circuit court for Oconto county: S. D. HASTINGS, Circuit Judge. *Reversed.*

This is an action for personal injuries received by the plaintiff while employed by the defendant at its lumber camp. The plaintiff was twenty-six years of age, and had been employed for some weeks prior to January 1, 1909, swamping and cutting roads in the woods. On the last named date he was assigned to the position of steerer of a steam log hauler,

used by the defendant company ·in its logging operations.
The log hauler somewhat resembles in appearance a railway
locomotive, but it does not run on a track, and it has wheels
with a broad tread, and is steered by turning the front
wheels, which are pivoted and operated by a wheel-steering
apparatus like a traction engine.   There is an engineer, fire-
man, and steerer.   When the roads are covered with snow a
bob sled is substituted for the front wheels.   Under the boiler
·of the engine and projecting forward two or three feet from
the front end thereof is a large rectangular iron tank, the
forward end of which rests on the steering wheels.   This
tank carries the supply of water necessary for the production
·of steam, and on the right side of the forward ·end of this
.tank sits the steerer, with the steering wheel at ·his right.   At
the left side of the steerer is a round hole in the top of the
tank, eight or nine inches in diameter, with a collar projecting
upward several inches.   When the plaintiff went to work
there was a large wooden plug fitted into this hole or collar,
having in its center a hole an inch in diameter as a vent hole.
It was necessary to fill the tank six or seven times a day, and
when filling was necessary the machine was run down to a
creek near the logging road and an apparatus in the nature
of a siphon was used.   This siphon was constructed as fol-
lows: From the steam dome of the engine a permanent steam
pipe runs downwards and turns into the side of the tank.   In
this pipe there is an opening a few inches above the tank, and
to this opening a rubber hose is connected, the other end of
which runs down into the creek.   The steam is then turned
on from the dome, and as it rushes down the steam· pipe into
the tank it draws the water up in the rubber hose into the
steam pipe, and from there it naturally goes into the tank.
How.much pressure is developed in the steam tank during this
operation is not shown.   It was the plaintiff's duty, in addi-
tion to steering the machine, to help about the filling of the
tank, and to remove the large wooden plug during the filling

to ascertain how nearly full the tank was, in order to notify the engineer to stop the filling. He was never notified that there was any danger in this process, and in fact there seems to have been no danger with the wooden plug. Of course, if there was any pressure in the tank, the inch vent hole in the wooden plug would relieve it. The plaintiff claims that when the tank was filled and the machine went down hill the water would frequently crowd out the plug and splash over him, and that he was told by some employee that there was a metal cap in the roundhouse which belonged on this place and on the machine, which might fit better. On Sunday, January 10th, he found this metal cap and put it on the opening without authority from any one. This cap was of sheet iron and fitted closely into the collar, and was provided with a metal cross-piece or strap on top, which could be turned so as to catch under two lugs or hooks on the collar and thus fasten it on. There was a round hole about an inch in diameter in the top of the cap, and the plaintiff found with the cap a piece of three-quarter-inch gas pipe, about nine inches long, with a hollow nut fastened on one end. He then conceived the idea that he could construct, with this pipe, an automatic gauge, which would at all times show the height of the water in the tank and avoid the necessity of removing the cap for that purpose. To accomplish this he placed the pipe upright in the hole in the top of the cap and fastened it securely with a rubber gasket, procured a wooden block in which he fastened a small iron rod or large wire vertically, and put the block in the tank, with the rod or wire projecting upward through the gas pipe, the idea being that the float would rise and fall with the water, and the height of the rod or wire above the top of the pipe would indicate the amount of water in the tank. With this arrangement fastened on the tank the hauler was taken out by the crew on Monday morning. It is conceded that the cap (but without the pipe) came with the machine and was originally used on it, but had been discarded

for some reason a year or so previously.   One Herald was the foreman of the gang, and plaintiff claims that when Herald saw the cap that morning he said nothing by way of warning or disapproval, but made some offhand remark, and laughed and went on.   Herald claims that he told him (the plaintiff) to put the plug back in as soon as he saw the change, because when the tank was filled the first time it bulged and cracked. The cap remained on till afternoon, and the tank had been filled four times, but the gauge did not work and plaintiff threw it away, and took off the cap each time the tank was filled to ascertain where the water was.  ' At the fourth filling he started to take the cap off by turning it and releasing the metal strap from the hooks, when it suddenly blew off, striking him above the eye, and inflicting serious injuries.   The negligence claimed is failure to warn the plaintiff of the danger.

The jury rendered the following special verdict:

"(1) Was the plaintiff injured by reason of the pressure on the inside of the water tank blowing the cap off, while he was trying to remove the cap?   A. Yes (by the court).

"(2) Did the plaintiff know and appreciate the danger of attempting to remove the cap while the water was being forced into the tank?   A. No.

"(3) If you should answer the second question 'No,' then answer this: Ought the plaintiff by the exercise of ordinary care to have discovered said danger before he was injured? A. No.

"(4) Ought a man of ordinary intelligence and prudence in Mr. Herald's position, to have known the danger of the cap being blown off by the pressure on the inside of the tank, while the tank was being filled?   A. Yes.

"(5) Was it part of the plaintiff's duty to remove the cap while the water tank was being filled?   A. Yes.

"(6) If your answer to the fifth question should be 'No' and to the fourth question 'Yes,' then answer this: Ought a man of ordinary intelligence and prudence in Mr. Herald's position, to have reasonably anticipated that, if the plaintiff was not told of or warned against the danger of the cap being

blown off by pressure from the inside while the tank was being filled, the plaintiff would attempt to remove it, while the tank was being filled?  *A.* ———.

"(7) Was Mr. Herald guilty of negligence in not warning the plaintiff against the danger of said cap being blown off, by the pressure from inside the tank, if he attempted to remove it while water was being filled in?  *A.* Yes.

"(8) If you should answer the seventh question 'Yes,' then answer this: Was said negligence the proximate cause of the plaintiff's injury?  *A.* Yes.

"(9) Did any want of ordinary care on the part of the plaintiff contribute proximately to his injury?  *A.* No.

"(10) What amount of money will compensate the plaintiff for his injury?  *A.* $1,750."

Motions by the defendant for judgment notwithstanding the verdict, and to change the answers of the verdict and render judgment for defendant thereon, and for a new trial, were successively overruled, and judgment was rendered for the plaintiff on the verdict.  From this judgment the defendant appeals.

*Allan V. Classon,* for the appellant.

For the respondent there was a brief by *F. X. Morrow* and *W. L. Evans,* attorneys, and *Sheridan, Evans & Merrill,* of counsel, and oral argument by *W. L. Evans.*

WINSLOW, C. J.  The only claim of negligence is that there was a failure to warn the plaintiff of an occult danger, and the only question now raised is whether the jury's verdict that there was such failure has any justification in the evidence.  We think this question must be answered in the negative for very apparent reasons.  It is practically conceded that the wooden plug which was in use when the plaintiff went to work was in no respect. dangerous.  Had the plaintiff been content to work with the machine which was furnished him, the accident never would have happened.  He created the danger when, of his own motion, he replaced the

wooden plug with the metal cap. But it is claimed that he was entirely justified in putting the metal cap which was made for the machine back upon it, and that when he did so he should have been informed by the foreman that there was a concealed danger in its use, namely, the danger that there would be pressure in the tank as it filled with water, and that such pressure might be great enough to blow off the cap in case the vent became obstructed by freezing, as is thought to have been the case.

Employers who set men at work about complicated machinery are justly charged with the duty of explaining to inexperienced or youthful employees any dangers which exist about such machinery and which are not apparent to employees of like apparent age and experience while exercising ordinary care.

The employee, whether young or old, who earns his bread by his daily toil, is rightly entitled to be protected from pitfalls in his path and from dangers which are not apparent. No court, it is believed, has more jealously guarded the safety of the employee in these respects than this court.

Nevertheless, the law does not expect the unreasonable. It does not require the employer to treat an intelligent employee as if he had parted company with his ordinary reasoning powers, or checked his common sense at the parcel room when he entered upon his work. In a word, it requires the employees of ordinary intelligence to know and act upon those simple natural laws and physical facts which are universally acted upon by persons of like apparent intelligence in the ordinary affairs of life.

The only material facts which the employer in this case could have imparted to the employee were: (1) that when the tank was being filled with water by the steam siphon arrangement, some pressure on the tank would result in case there was no vent hole in the cap; and (2) that the vent hole in the

metal top might freeze up on a cold day and thus create a pressure which might be sufficient to blow off the top when the metal strap was disengaged from the hooks.

There would perhaps be room to hold that these matters should be explained to an inexperienced boy, but this plaintiff was neither a boy nor was he inexperienced. He was a man of twenty-six years of age, of ordinary brightness and intelligence. It appears by his own testimony that he attended school in his boyhood and finished the eighth grade, taking grammar, history, arithmetic, and (as he expresses it) "the studies that are called English;" that he was accustomed to read the local newspapers and story books; that he had lived in the city of Oconto most of his life; that for twelve years before his injury he had been at work in or about sawmills and lumber camps; that for most of the time he worked for the Oconto Lumber Company, and saw more or less of the different parts of the mill and the workings of machinery; that for four months he was a carriage rider in the mill, operating what is called a "cross feed" saw carriage; that for two months he ran a planer in the mill, starting it and stopping it himself; that he had been in the engine room and seen the engine and other machinery there a number of times; that he had loaded and graded lumber. In fine, it appears by his own testimony that, while not perhaps a skilled laborer, he was certainly something more than an ordinary day laborer, and must have known those things concerning the machinery of lumber mills and camps which the ordinarily intelligent man will pick up during twelve years of such experiences, whether he will or not.

True, he testified that he did not know what steam was used for, nor how it was used, also that he did not know anything about a steam engine, and that he did not know that the siphon was operated by steam, or that there must be pressure in the tank if there was no vent when the water flowed into it. Some

of these statements are in effect contradicted by statements in the plaintiff's deposition taken before trial under sec. 4096, Stats. (Laws of 1907, ch. 369); but even if they stood without actual contradiction they absolutely refute themselves. They are to all intents and purposes an affront to the intelligence. No being endowed with even a small degree of human reason could work in and about steam machinery for twelve years and remain in that state of complete ignorance which the plaintiff professes. His own invention of the self-registering float or gauge, which he expected to relieve him of the necessity of removing the cap, abundantly shows not only that he knew the elementary laws of nature, but had considerable mechanical ingenuity and initiative. He was almost, if not quite, an inventor.

Taking into consideration the plaintiff's age, his early education, his years of experience with machinery, his demonstrated knowledge of elementary physical and natural laws, we are fully convinced that it must be said as matter of law that he must be conclusively presumed to have known of any danger that there was present in the filling of the tank with the siphon while the metal top was in use. Whatever dangers there were simply arose from well known natural laws of which a man with his experience could not be ignorant and concerning which he required no warning.

*By the Court.*—Judgment reversed, and action remanded with directions to enter judgment for the defendant notwithstanding the verdict.